UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| MICHAEL JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16-1244 |
| | ) | |
| SUSAN PRENTICE, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## SUMMARY JUDGMENT ORDER

Plaintiff, proceeding pro se and presently incarcerated at Joliet Treatment Center, brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging inadequate mental health and medical care and inhumane conditions of confinement arising from events that occurred while he was incarcerated at Pontiac Correctional Center. The matter comes before this Court for ruling on the Defendants' respective Motions for Summary Judgment. (Doc. 76, 92). The motions are granted.

**PRELIMINARY MATTERS**

**Plaintiff's Motions to Request Counsel (Docs. 104, 105)**

Plaintiff has no constitutional or statutory right to counsel in this case. In considering the Plaintiff's motion, the court asks: (1) has the indigent Plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself? *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007). Plaintiff previously made a showing that he attempted to obtain counsel on his own.

As to the second prong, the Court conducted a detailed analysis of Plaintiff's capacity to represent himself at this stage of the proceedings in its Order entered August 29, 2018. *See* (Doc. 101). The Court assumes familiarity with that Order.

In his current motions, Plaintiff asserts that he has completed some high school, that he currently takes medications to treat diagnosed mental illnesses, and, because he is mentally ill, he suffers from mental breakdowns when things are overwhelming. Plaintiff also asserts that the issues in this case are overly complex, but he does not elaborate further.

Plaintiff attached a document dated May 5, 2018, describing an episode Plaintiff experienced while he was incarcerated at Dixon Correctional Center. (Doc. 105-1). The Court has already addressed the contents of this document in its previous rulings on Plaintiff's motions for recruitment of counsel. *See* Text Order dated Aug. 6, 2018; (Doc. 101). Plaintiff does not provide any new information on this point or any other point the Court previously considered. Further, Plaintiff has since filed a response to Defendants' motion for summary judgment. (Doc. 108). In the response, Plaintiff adequate conveys the facts of the case and, although he does not appear to have attached the documents he cites, Plaintiff provides specific dates that the Court can cross-reference with the available medical records. As explained in the Court's previous order, this was all that was required at this stage in the proceedings. Accordingly, for these reasons and the reasons stated in the Court's previous orders, Plaintiff's motions for recruitment of counsel are denied.

**Plaintiff's Motions (Docs. 102, 103, 106, 107)**

Plaintiff's motions seek this Court's recusal from this matter. 28 U.S.C. § 455 requires a judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned. However, the negative bias or prejudice from which the law of recusal protects a

party must be grounded in some personal animus or malice that the judge harbors against him, of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes. *Hook v. McDade*, 89 F.3d 350, 355 (7th Cir. 1996). In addition, this bias must...arise from an extrajudicial source. *Id.* Finally, recusal is required only if actual bias or prejudice is proved by compelling evidence. *Id.* (citing *U.S. v. Balistrieri*, 779 F.2d 1191, 1202 (7th Cir. 1985)).

Plaintiff accuses the Court of "attacking" him and "making every effort to make this case difficult for [him]." (Doc. 102). Plaintiff has not provided any evidence of the Court's bias other than his own beliefs that the Court erred in its rulings on his motions seeking recruitment of counsel. Speculative personal opinions are not sufficient to obligate the Court to further explore Plaintiff's allegations. *Willis v. Freeman*, 83 Fed. Appx. 803, 805 (7th Cir. 2003) (citing *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 988-89 (7th Cir. 2001)). Furthermore, "judicial rulings alone almost never constitute a valid basis for a recusal motion." *Id.* (quoting *Grove Fresh Distrs., Inc. v. John Labatt*, 299 F.3d 635, 640 (7th Cir. 2002)). The other matter Plaintiff alleges in his most recent motion is not related in any way to this lawsuit. To the extent that Plaintiff seeks this Court's recusal, the motions are denied.

Plaintiff also seeks a transfer of venue to the Northern District of Illinois. (Doc. 103). Venue for federal civil rights actions brought under 42 U.S.C. § 1983 is governed by 28 U.S.C. § 1391(b). According to that statute, such actions may be brought only in (1) the judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought. *Id.*

Plaintiff concedes in his motion that the relevant events took place within this judicial district. Nonetheless, Plaintiff seeks transfer to the Northern District, where he currently resides, "for purposes of having a judge to look at this case with new eyes [and] having a judge who is not colluding with the Defendants seeking to sabotage [his] case…." Plaintiff provides no evidence supporting these allegations and any complaints of bias were addressed above. The Court sees no basis to transfer this case for the reasons Plaintiff sets forth. Accordingly, Plaintiff's request for a transfer of venue is denied.

### Plaintiff's Motion to Withdraw Deidre Marano (Doc. 96)

The Court interprets Plaintiff's request to withdraw Deidre Marano as a motion to voluntarily dismiss this defendant from the lawsuit. The motion is granted.

### LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in his favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## FACTS

Plaintiff was incarcerated at Pontiac Correctional Center ("Pontiac") from March 2013 until December 2016. Defendants Moss, Haag, Duckworth, McCormick, Ojelade, Lanterman, Tilden, and Wexford Health Sources, Inc. were responsible for Plaintiff's mental health and medical care at Pontiac. Defendant Moss, Haag, Duckworth, and Lanterman were mental health professionals; Defendant McCormick was a psychiatrist; Defendant Tilden was a physician; and, Defendant Ojelade was a physician's assistant. Defendant Wexford Health Sources, Inc. ("Wexford") employed these defendants in its capacity as the company contracted to provide medical and mental health services at Illinois prisons.

The remaining Defendants (collectively, the "IDOC Defendants") were employed at Pontiac in the following capacities: Defendant Melvin served as the Assistant Warden of Programs, and later as the Warden; Defendants Prentice and Hasdall were correctional majors; Defendant Boland was a correctional lieutenant; Defendant Gasper was a correctional sergeant; Defendant Kelley was a correctional counselor, and also served as the Assistant Warden of Programs from March through August 2016; Defendant Kennedy was a casework supervisor; and, Defendants DeVries, Myers, and Henkel were correctional officers.

Plaintiff was transferred to Pontiac from Lawrence Correctional Center ("Lawrence") for disciplinary reasons after he was found guilty of several rules violations over a period spanning approximately three months.[1] At the time of his transfer, Plaintiff was serving a term of segregation as punishment for two separate violations for disobeying a direct order. (Doc. 93-14

---

[1] Specifically, Plaintiff was found guilty at Lawrence of assaulting a staff member, intimidation, fighting, damage or misuse of property, impairment of surveillance, and, on seven (7) separate occasions, disobeying a direct order. (Doc. 93-14) at 3-4. Plaintiff's punishment for these violations included a disciplinary transfer, revocation of good-time credits, demotion in grade to C-grade, restitution, restrictions on contact visits, segregation, and yard restriction. *Id.*

at 4-5) (decisions dated March 23, 2013, and March 26, 2013). Plaintiff accrued additional segregation time thereafter for numerous offenses he committed at Pontiac.[2] *Id.* at 3-7 (segregation time totaling 51 months imposed for rules violations committed from March 2013 through August 2016). As a result, Plaintiff remained in segregation and the North Cell House at Pontiac from his arrival until August 2016, when he was transferred to the South Cell House.

Plaintiff was transferred cells approximately 40 times between June 2014 and August 2016. (Doc. 76-10 at 2-3). The frequency of these cell transfers made Plaintiff's stay in any given cell relatively short: on at least 25 occasions, Plaintiff's stay lasted less than 14 days; eight (8) stays lasted between 15-30 days; and, four (4) stays lasted between 30-60 days. The longest duration Plaintiff was housed in any cell lasted 150 days on one occasion. *Id.* Plaintiff was provided with a styrofoam cup "half-filled with green liquid" once per week, but he was not provided any other cleaning materials. Pl.'s Dep. 74:15-16.

Plaintiff testified that the cells had different types of doors (solid plexiglass or metal, plexiglass with perforated holes, or bars). Pl.'s Dep. 56:5-24. In the cells with solid doors, Plaintiff testified that poor airflow made the cells uncomfortably warm. Pl.'s Dep. 23:18-23 (temperatures reached 90-100 degrees in cell with solid door); 53:7-9 ("I am in a cell…behind a solid metal door, solid plexiglass. Temperatures are extremely hot.").

Plaintiff told officials about the heat on July 9, 2016, when he stated to Defendant Haag, "I'm dying in this bitch behind plexiglass with no fan." (Doc. 78-9 at 9); and, on July 10, 2016, Plaintiff told Defendant Duckworth that he was "depressed about…not getting a fan." (Doc. 78-10 at 1). On August 7, 2016, Plaintiff stated to Defendant Duckworth that "he bugged up

---

[2] These offenses include including assaulting a staff member, disobeying a direct order, insolence, providing false information, spitting on other inmates, possession of contraband, health and safety violations, and impairment of surveillance. (Doc. 93-14 at 3-7).

because it was so hot." (Doc. 78-10 at 4). On these three dates, Plaintiff's "property [was] limited due to potential for self-harm." (Doc. 78-9 at 10); (Doc. 78-10 at 2, 4). Fans were otherwise available for purchase through the commissary, but Plaintiff could not afford one. No policy existed at the prison that permitted officials to loan a fan to an indigent inmate. Melvin Aff. (Doc. 93-3).

Plaintiff, however, was not left to suffer; he conceded in his deposition that prison officials provided ice and operated fans at the ends of the gallery as a means to provide relief to inmates when temperatures rose. Pl.'s Dep. 90:16-91:11. Nor did Plaintiff's stay in those cells last an extended period of time: Plaintiff was transferred to a different cell seven (7) days after the July 2016 complaints, and one (1) day after the August 2016 complaints. (Doc. 78-10 at 2). The record does not disclose, nor does Plaintiff specify, any additional cells or timeframes in which temperature became an issue.

Plaintiff appears to have been primarily confined indoors. Per his disciplinary records, Plaintiff accrued yard restrictions for multiple infractions. At most, Plaintiff's yard privileges would have been restricted from April 2013 until July 2013; from January 2014 until October 2014; and, from December 2014 until January 2017.[3] The yard restriction limited Plaintiff's access to the outdoor recreation yard to a maximum of once per month. Pl.'s Dep. 47:24-48:3.

Plaintiff testified that he made requests to Defendants Myers, Henkel, and DeVries on separate occasions, respectively, to go to the recreation yard. *Id.* 47:1-52:19. Plaintiff does not remember the exact dates, but he testified that he made each of these requests at some point after

---

[3] The records do not indicate that a yard restriction was in place at the time Plaintiff was transferred. In April 2013, Plaintiff received three (3) months yard restriction and no additional yard restriction was imposed before expiration of that period. In January 2014, Plaintiff received six (6) months yard restriction. Plaintiff received another three (3) months yard restriction for a May 2014 rule violation. If the latter took effect after expiration of the original 6-month restriction, the yard restriction would have expired in October 2014. In December 2014, Plaintiff received four (4) months yard restriction, and if imposed consecutively, the yard restrictions Plaintiff accrued as discipline for multiple rules violations from December 2014 through February 2016 would have expired in January 2017.

December 2014.  Plaintiff did not go to yard on those days.  *Id.*  Plaintiff also testified that Defendant Prentice denied him access to the yard an unspecified number of times because his cell was not in compliance with the applicable prison rules.  Pl.'s Dep. 60:15-62:20.  Plaintiff does not remember the dates of his interactions with Defendant Prentice.

Plaintiff testified that the conditions he endured while housed in segregation caused him to bang and kick at the cell door, scream, and smear feces on all available surfaces, including himself.  Pl.'s Dep. 42:8-23.  These behaviors, however, were not exclusive to Pontiac as Plaintiff had a history of these behaviors while confined at different prisons dating back to 2008.  (Doc. 93-14 at 1-4).  Plaintiff also attributed his actions at Pontiac to the depressive and bipolar disorders with which he had been diagnosed.

Plaintiff's mental health conditions predate his incarceration, and he had received inpatient psychiatric treatment on several occasions prior to his arrival at IDOC.  Pl.'s Dep. 29:9-24.  Plaintiff's mental health treatment team at Pontiac consisted of Defendants McCormick, Moss, Haag, Duckworth, and Lanterman, as well as several non-defendant psychiatrists and mental health professionals (collectively, the "Mental Health Defendants"), who monitored Plaintiff's condition through examinations and regular contact.  From March 2013 through August 2016, Defendant McCormick met with Plaintiff on at least ten (10) occasions, not including several scheduled examinations that did not happen because of Plaintiff's refusal to attend, time constraints, operational delay within the prison, or prison lockdowns.  Plaintiff otherwise met with Defendants Moss, Haag, Duckworth, and Lanterman on a regular basis, with the frequency of these visits changing as needed.  Routine appointments were generally scheduled every four-to-six weeks.

Defendant McCormick and non-defendant psychiatrists prescribed Plaintiff several different medications to treat his mental health conditions over the relevant time period, including Thorazine, Vistaril, Risperdal, Cogentin, Depakote, Lamictal, Sertraline, Zoloft, and Lithium. Plaintiff reported positive results, or otherwise did not identify any issues, with most of these medications when he took them as prescribed. *See* (Doc. 78-6 at 1) (Plaintiff reported to Defendant Haag that he was taking medication and that "he is good."); (Doc. 78-7 at 6) (Plaintiff reported to Defendant Moss that the new medications were "working well."); (Doc. 78-8 at 5) ("No concerns voiced" to Defendant Lanterman); (Doc. 78-9 at 2) (Plaintiff stated "I'm all right" to Defendant Haag). If no issues were reported, the psychiatrists renewed the medications. *See* (Doc. 93-15 at 42) (Dr. Dempsey, a non-defendant, continued Depakote prescription); *id.* at 54, 61 (Dr. Dempsey continued Lamictal prescription in June and July 2014); (Doc. 93-16 at 3, 26) (Dr. Dempsey continued Lamictal prescription in March and September 2015); (Doc. 93-16 at 61) (Defendant McCormick renewed Lithium prescription in July 2016).

The medications were also adjusted when Plaintiff reported adverse side effects. *See* (Doc. 93-15 at 12, 39) (Plaintiff's Cogentin and Risperdal prescriptions modified in October 2013 and March 2014, respectively, after Plaintiff reported adverse side effects); (Doc. 78-8 at 1) (Plaintiff's Zoloft prescription modified in February 2016 for same reasons). But, ultimately, the decision to discontinue or change any given medication was largely predicated on Plaintiff's willingness to take it. *See* (Doc. 93-15 at 9, 21, 48) (Thorazine, Risperdal and Cogentin, and Depakote discontinued after Plaintiff refused it in August 2013, December 2013, and May 2014, respectively); (Doc. 93-16 at 51) (Zoloft discontinued in March 2016 after nurses reported Plaintiff was consistently refusing it). Once Plaintiff's noncompliance became a recurring issue, Plaintiff's mental health treatment team discussed the possibility of the forced administration of

these medications, but opined that Plaintiff was not a good candidate for that option. (Doc. 76-3 at 4).

Plaintiff was placed on crisis watch at least seven (7) times after he expressed a desire to hurt himself or others: once in 2013 and 2015, respectively; twice in 2016; and, four (4) times between January 2014 and May 2014. *See* (Doc. 93-15 at 4-6, 26-27, 34-36, 42, 45-49); (Doc. 93-16 at 30-33, 46); (Doc. 78-9 at 9). This classification resulted in Plaintiff's placement in a crisis cell with his access to property limited to a suicide smock and blanket because of the risk Plaintiff would try to hurt himself. Generally speaking, officials would check on Plaintiff every 10-15 minutes while Plaintiff was so classified, and mental health professionals and psychiatrists would monitor Plaintiff's status on a daily basis. As his condition improved, Plaintiff was permitted additional property and access to other services. Aside from the first instance in May 2013, Plaintiff's medications were adjusted shortly after each crisis watch.

Plaintiff was also examined approximately 50 times over the relevant time period for medical issues not related to his mental health conditions, mostly for relatively non-serious conditions (colds, athlete's foot, hemorrhoids). Plaintiff testified in his deposition that he sued Defendants Tilden and Ojelade for an alleged failure to treat heart palpitations, muscles cramps and atrophy, nosebleeds, headaches, skin infections, and respiratory problems Plaintiff attributes to his cell conditions. Pl.'s Dep. 24:13-26:8.

For skin conditions, Defendant Tilden examined Plaintiff for nodular acne in July 2014, for which he prescribed Keflex (an antibiotic) and lotion. (Doc. 78-2 at 8). Medical reports appear to indicate improvement in this condition three months later during an examination with a non-defendant medical provider. (Doc. 93-15 at 66). In April 2015, Defendant Ojelade diagnosed Plaintiff with chronic cystic acne. (Doc. 93-16 at 10). Defendant Ojelade prescribed

an oral antibiotic to prevent infection of a small wound Plaintiff had on his hand, apparently from excess scratching, and an antibiotic cream. (Doc. 76-2 at 2, ¶ 6). During an annual physical exam in January 2016, Defendant Ojelade noted that Plaintiff had no open lesions, polyps or muscle atrophy. *Id.* at 3, ¶ 8.

Upon a referral from Defendant McCormick, Defendant Ojelade examined Plaintiff in April 2016 for "acne with a dry wound that occurred from [Plaintiff] scratching a lesion." (Doc. 76-2 at 3). After Plaintiff reported that hydrocortisone cream had not worked in the past, Defendant Ojelade prescribed an oral antibiotic and a different type of medicated cream to reduce acne-causing bacteria. (Doc. 93-16 at 52). Defendant Ojelade scheduled a follow-up appointment in three months. The medical records disclose no further issues for this condition.

Plaintiff first complained of muscle cramps in his shoulder and back in May 2016. During the initial examination for this condition, a nurse prescribed an over-the-counter pain medication and advised Plaintiff to follow up as needed. (Doc. 93-16 at 54-55). Defendant Ojelade examined Plaintiff on June 2, 2016, for Plaintiff's complaints of occasionally shaky hands, and advised Plaintiff to increase regular exercise. *Id.* at 58. Plaintiff refused sick call for muscle cramps in July 2016. (Doc. 93-16 at 59-60).

Defendant Tilden examined Plaintiff in July 2016, and he opined that dehydration was causing Plaintiff's muscle spasms. (Doc. 93-16 at 63). Defendant Tilden prescribed Motrin and Robaxin. Defendant Tilden also advised Plaintiff to increase his hydration levels and return to sick call as needed. The medical records reveal no further complaints from Plaintiff for this issue.

# ANALYSIS

To prevail on his claims that prison officials violated the Eighth Amendment, Plaintiff must show that (1) he suffered an objectively serious deprivation that resulted in the "denial of the minimal civilized measure of life's necessities," and (2) that prison officials acted with deliberate indifference in response to the situation. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A prison official's subjective awareness of a risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842.

## Conditions-of-Confinement

Plaintiff was housed in segregation at Pontiac from May 2013 until August 2016. Prolonged confinement in segregation "may constitute a violation of the Eighth Amendment…depending on the duration and nature of the segregation and whether there were feasible alternatives to that commitment." *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017). As an initial matter, Plaintiff's confinement in segregation was not the result of a single punishment, but rather the cumulative punishments Plaintiff received for numerous disciplinary infractions he committed while housed at Pontiac. Plaintiff cannot aggregate these punishments to argue that the duration of his confinement in segregation resulted in a single, long-term deprivation; instead, the Court must evaluate each punishment separately. *Pearson v. Ramos*, 237 F.3d 881,

886 (7th Cir. 2001) ("Every disciplinary sanction…must be treated separately, not cumulatively, for purposes of determining whether it is cruel and unusual.").

Plaintiff does not challenge the individual punishments imposed for the violations he committed, and nothing about these punishments suggests that they were excessive in relation to the infraction committed or imposed without penological justification.  Accordingly, the Court finds that no reasonable juror could conclude that the duration of Plaintiff's confinement in segregation, or the lengths of time for which the yard restrictions were imposed, on their own, violate the Eighth Amendment.

That said, the Court must still evaluate Plaintiff's claims regarding the conditions he allegedly endured.  Prison conditions may be uncomfortable and harsh without violating the Constitution.  *Dixon v. Godinez,* 114 F.3d 640, 642 (7th Cir. 1997).  Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." *Henderson v. Sheahan,* 196 F.3d 849, 845 (7th Cir. 1999).  "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so along, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need…." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).  Plaintiff asserts he was forced to endure excessive heat without a fan inside his cell, that he was exposed to unsanitary conditions without adequate cleaning supplies, and that he was denied access to the outdoor recreation yard for an extended period of time.

The excessive heat, according to Plaintiff, resulted from the lack of ventilation in the cell and officials' refusal to provide him with a fan free-of-charge.  Plaintiff could not have experienced excessive heat in every cell as his testimony regarding the different construction of cell doors suggests that the level of airflow within the cells also varied.  Plaintiff's documented

complaints are also limited to the summer months. Even assuming the temperatures reached 90-100 degrees as Plaintiff opined, prison officials provided Plaintiff with ice when the temperatures rose and operated fans at the ends of the galleries to alleviate the heat. Plaintiff's stay in the offending cell was short-lived and his access to property was restricted because he was on crisis watch for suicidal thoughts. Plaintiff does not otherwise identify any specific cell in which temperature became an issue.

The presence of feces inside a cell could be considered sufficiently serious, *see Vinning-El v. Long*, 482 F.3d 923, 923-25 (7th Cir. 2007) (feces smeared on walls is sufficiently serious deprivation), but, again, Plaintiff has not provided any evidence regarding the duration of time he was exposed to such conditions, or identified any specific prison official responsible for the alleged deprivation. Plaintiff was disciplined multiple times for offenses involving use of his own feces, but only one of those incidents involves the presence of human feces within Plaintiff's cell to the extent that the continued exposure could be considered sufficiently serious. *See* (Doc. 93-14 at 10) (Plaintiff smeared feces on his cell window); *compare id.* at 8 (Plaintiff pushed a tray of feces into another cell); *id.* at 11 (Plaintiff threw feces at another cell). This condition, however, could not have persisted for any significant length of time as Plaintiff was housed in a crisis cell with well-being checks conducted every ten (10) minutes. Plaintiff refused several orders to clean his cell once officials noticed it, and officials removed him from that cell shortly thereafter.

Finally, as to the yard restrictions, the denial of outdoor exercise for any duration may violate the Eighth Amendment if serious psychological or physical consequences result therefrom. *Pearson*, 237 F.3d at 886; *Gruenberg v. Schneiter*, 474 F. App'x. 459, 462-63 (7th Cir. 2012). The extent to which Plaintiff was permitted access to the outdoor recreational yard is

unclear. Plaintiff testified that even those inmates on yard restriction were permitted access to the yard once per month, but that he was denied access to same on several occasions for which he cannot provide dates more specific than "after December 2014." Plaintiff also testified that Defendant Prentice denied him access to the yard because he was not in compliance with prison rules at the time of his requests.

Plaintiff does not assert that he was wholly denied the opportunity to exercise. Plaintiff could still move around in his cell to a certain extent, and the outdoor recreational area was not that much bigger than his cell. Pl.'s Dep. 92:6-23. Prison officials were also entitled to attach conditions aimed at addressing legitimate penological concerns upon Plaintiff's access to the yard. If, as Plaintiff suggests, a prison rule required his cell to be orderly before he was granted access, prison officials do not violate the Constitution merely through its enforcement. *Rodriguez v. Briley*, 403 F.3d 952, 952-53 (7th Cir. 2005) ("[D]eliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment.").

Nonetheless, Plaintiff cannot show that he suffered adverse health consequences as a result of the denial of access to the yard. The medical records disclose that Plaintiff reported some improvement in his mental health conditions throughout the relevant timeframe. Defendant Ojelade opined that Plaintiff suffered from occasional shaky hands due to a lack of exercise, but nothing connects this condition with the denial of access to the outdoor recreational yard. Plaintiff's mental health and medical issues are discussed in further detail below.

Regardless of whether the deprivations Plaintiff alleges are evaluated individually or in combination, the Court finds that no reasonable juror could conclude on the record presented that Plaintiff suffered the type of extreme deprivation required to prevail on a conditions-of-

confinement claim. Moreover, no reasonable inference exists that prison officials acted with deliberate indifference towards any risk of harm Plaintiff faced.

### Plaintiff's Mental Health and Medical Care

Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). To prevail, a plaintiff must show that the prison official acted with deliberate indifference to a serious medical need. *Id.* at 105. Plaintiff's access to mental health or medical treatment is not at issue, and neither party asserts that Plaintiff's conditions were not objectively serious.

In the medical context, treating physicians are entitled to deference. *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). To constitute deliberate indifference, a treatment decision must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (en banc). In other words, a medical professional is deliberately indifferent only if "'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

Circumstances that could permit such an inference include: persisting in a course of treatment known to be ineffective; failure to follow an existing protocol; inexplicable delays in treatment without penological justification; and, refusal to follow a specialist's recommendations. *Petties*, 836 F.3d at 729-30. Claims of negligence, medical malpractice, or disagreement with a prescribed course of treatment, however, are not sufficient to impose constitutional liability. *See id.*; *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).

Plaintiff argues that the Defendants should have recognized that the conditions he allegedly endured while at Pontiac caused the symptoms he presented, and that failure to alleviate these conditions through his release from segregative confinement, granting access to the recreational yard, and providing him with a fan violated the Constitution.

As to causation, Plaintiff's mental health issues arose prior to his incarceration at any prison, and his disciplinary records disclose behaviors similar to those he allegedly displayed while at Pontiac long before the relevant time period. Further, Plaintiff's behavior was not always related exclusively to his cell conditions or mental health issues. *See* Pl's Dep. 35:1-17 (the rules violations Plaintiff committed at Lawrence were motivated by a desire to force a transfer to another facility); (Doc. 93-14 at 13) (Plaintiff's mental health condition did not contribute to his actions in spitting on another inmate); (Doc. 78-9 at 1) (Plaintiff told Defendant Moss that "he returned to [segregation] because he lives off the gallery via trading and on 8 gallery people don't even talk to the [inmates]."); (Doc. 99-1 at 7) (Plaintiff falsely conveyed that he was suicidal in an effort to persuade mental health officials to "be more of an advocate to help with his legal cause and also issues with owing the state money."). The record does not otherwise permit a reasonable inference that the conditions in segregation at Pontiac caused or exacerbated Plaintiff's issues.

Even assuming Plaintiff could establish the connection he asserts, the actions the Defendants took in addressing Plaintiff's mental health and medical issues do not permit a reasonable inference that they ignored any substantial risk of harm Plaintiff faced, unreasonably delayed or persisted in a course of treatment known to be ineffective, or based their decisions on factors not related to the exercise of sound medical judgment.

The Mental Health Defendants continuously monitored Plaintiff's mental health condition throughout the relevant timeframe, and they adjusted Plaintiff's medications in response to any issues that arose. Plaintiff's treatment team also addressed Plaintiff's recurring noncompliance with the prescribed medications within the context of whether forced administration of those drugs was appropriate, though they ultimately declined to pursue that treatment option. Less than a month after this option was discussed, Plaintiff reported that his new medication was "working well." (Doc. 78-7 at 6, 8).

Plaintiff also has not offered any evidence to show that the Mental Health Defendants had any authority to order the relief Plaintiff sought. The record discloses that the Mental Health Defendants had authority over Plaintiff's cell placement and property only when Plaintiff was on crisis watch. As this designation encompassed situations where Plaintiff had indicated a desire to hurt himself, no reasonable juror could conclude that the decisions to confine Plaintiff in a cell with limited access to items that he could use to inflict self-harm ran contrary to acceptable medical judgment. To the extent that Plaintiff's desired remedy could be considered treatment, he had no constitutional right to demand it. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Nor, as noted above, does his disagreement with the treatment provided support a finding of deliberate indifference.

For the physical conditions Plaintiff identified during his deposition, Defendants Tilden and Ojelade only examined Plaintiff a handful of times. For the skin conditions, Plaintiff generally showed improvement after receiving treatment or otherwise did not report any significant issues thereafter. On the one occasion where Plaintiff reported that hydrocortisone cream did not work, Defendant Ojelade prescribed different medications. For the muscle cramps, Plaintiff received pain medication, and when his complaints continued, he was

prescribed a different type of pain medication with other medications. No further problems were reported. Any other treatment Plaintiff received for these conditions was not attributable to any Defendant in this case.

In addition, Plaintiff cannot prevail on any medical claims against the IDOC Defendants. Plaintiff's requests for medical treatment were not ignored and no reasonable inference arises that Plaintiff's access to treatment was obstructed in any way. In this scenario, the IDOC Defendants were entitled to defer to the decisions made by the medical professionals providing treatment to Plaintiff. *See, e.g., Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (nonmedical prison officials "are entitled to defer to the judgment of jail health professionals" so long as the inmate's complaints are not ignored (citations omitted)).

Accordingly, the Court finds that no reasonable juror could conclude that the Defendants acted with deliberate indifference towards Plaintiff's serious mental health or medical needs. Because there is no underlying constitutional violation, Plaintiff's claims against Wexford also fail. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014).

**IT IS THEREFORE ORDERED:**

1) **Plaintiff's Motions [102][103][104][105][106][107] are DENIED for the reasons stated above.**

2) **Plaintiff's Motion [96] is GRANTED. Defendant Marano is dismissed with prejudice. Clerk is directed to terminate Defendant Marano.**

3) **Defendants' Motions for Summary Judgment [76][92] are GRANTED. The clerk of the court is directed to enter judgment in favor of Defendants and against Plaintiff. All pending motions not addressed above are denied as moot, and this case is terminated, with the parties to bear their own costs. Plaintiff remains responsible for the $350.00 filing fee.**

4) **If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion**

**for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith.** *See* **Fed. R. App. P. 24(a)(1)(c);** *see also Celske v Edwards***, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith.");** *Walker v. O'Brien***, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective).   If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.**

Entered this 15th day of November, 2018.


*s/Colin S. Bruce*
COLIN S. BRUCE
UNITED STATES DISTRICT JUDGE